Filed 10/7/14  In re R.E. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re R.E. et al., Persons Coming Under the Juvenile Court Law. | D065648 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3168A-B) |
| v. | |
| C.E., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Tahra C. Broderson, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego and Tilisha Martin for Minors.

C. E. (Mother) appeals two orders granting Welfare and Institutions Code[1] section 366.26 petitions filed by the San Diego County Health and Human Services Agency (Agency) to terminate her parental rights to her children, R.E. and I.E., and finding a permanent plan of adoption is appropriate for them. On appeal, Mother contends the evidence is insufficient to support the court's finding that the beneficial parent-child relationship exception did not apply to preclude a permanent plan of adoption for her children. She argues there is evidence showing her children have a beneficial relationship with her and would be harmed if that relationship was terminated by their adoption.

FACTUAL AND PROCEDURAL BACKGROUND

Mother is the mother of R.E., born in 2007, and I.E., born in 2011. Mother has a history of methamphetamine and alcohol abuse, prostitution, and domestic violence. When R.E. was two years old, he was removed from her custody based on her domestic violence with his father. After 18 months of reunification services, Mother reunited with R.E. and the juvenile court's dependency jurisdiction over him was terminated.

In 2012, Agency investigated reports that Mother allowed drug use and sales to occur in the home with R.E. and I.E. present. Mother admitted drinking a 40-ounce container of beer daily and tested positive for methamphetamine use. Mother could not identify all of the adults in her home who had access to her children. Mother admitted there was domestic violence with her boyfriend.

_____

1      All statutory references are to the Welfare and Institutions Code.

2

Agency filed section 300, subdivision (b), dependency petitions for R.E. and I.E., alleging Mother's substance abuse prevented her from adequately caring for them. At the December 2012 detention hearing, the juvenile court ordered the children detained in out-of-home care and granted Mother supervised visitation with them. Mother did not call them for the first nine days and did not visit them for the first month. She visited them once during the first two months.

At the February 2013 contested hearing on the petitions, the juvenile court found the allegations were true, removed custody of R.E. and I.E. from Mother, and ordered that reunification services be provided. The court also found D.W. was I.E.'s presumed father and ordered reunification services for him. I.E. was subsequently returned to D.W.'s care, but was removed 20 days later at D.W.'s request. In April, the children were placed in the same foster home and bonded with their foster parents. Because Mother did not participate in services during the reunification period and continued to use methamphetamine, Agency recommended her reunification services be terminated. At the September contested six-month review hearing, the court terminated Mother's services and set a section 366.26 hearing regarding termination of her parental rights and selection of an appropriate permanent plan for the children.

At the March 2014 contested section 366.26 hearing, the parties presented no witnesses; therefore, the juvenile court considered only those documents submitted by Agency that were admitted into evidence. The court considered the section 366.26 report of Agency social worker Folake Balogun, along with various addenda to it. Balogun recommended the court terminate the parental rights of Mother and the respective fathers

3

of R.E. and I.E., and choose a permanent plan of adoption for the children. She stated the children were adoptable because they were young, healthy, and appropriately developed. Their current foster parents had an approved home study and wanted to adopt the children, but were not interested in only guardianship. There also were other families interested in adopting sibling sets with R.E. and I.E.'s characteristics.

R.E. participated in individual therapy with James Staunton, who reported R.E. was sad and worried about Mother, was sometimes sad about not living with her, and showed signs of displaced anger toward him for Mother's missed visits. However, Staunton reported that R.E.'s anger and disruptive behavior had subsided since placement in his current foster home and was usually happy when interacting with him.

Balogun summarized Mother's visitation history. During the four-month period following termination of her reunification services, Mother visited her children six times and only sporadically called them. Mother did not keep in contact with the social worker to request visits and did not inform the social worker of her new telephone number. During visits with Mother, R.E. generally played by himself and I.E. preferred that his caregivers help him, sometimes causing Mother to cry. At times, R.E. would be upset with Mother for not calling him and would avoid her. After visits with Mother, the children reacted negatively and threw temper tantrums. R.E. apparently was confused by visits with Mother and believed there was a possibility he would return to her care. R.E. believed it was his fault Mother did not visit him more often and that he resided with his caregivers.

4

During a December 2013 visit, Mother discussed the case and cried openly in the children's presence, causing her to leave the area. I.E. began to cry and was consoled by his caregiver. When asked whether she was free of drugs, Mother replied, "I was a few days ago." At the end of that visit, the children easily separated from Mother, although R.E. agreed to hold her hand as they walked away with their caregivers.

Before another December 2013 visit, R.E. told his caregivers that he did not want to attend the visit. During that visit, Mother and the children played games and the children opened gifts from her. They easily separated from her at the end of the visit.

During the three visits in January and February 2014, the children enjoyed spending time with Mother, but easily separated from her at the end of the visits. Although Mother's visitation with the children became more regular for a while, she missed a February 2014 visit and did not contact the social worker to reschedule that visit.

When Balogun asked R.E. how he felt about his foster home becoming his "forever home," he replied, "not good," explaining he would rather live with Mother. However, when asked whether he would like to continue living with his current foster parents if he could not live with Mother again, R.E. indicated that he would. Balogun explained that he would stay with his foster parents if the court decided Mother could not take care of him, and reassured him he had not done anything wrong.

In recommending the court terminate Mother's parental rights, Balogun noted none of the exceptions, including the beneficial parent-child relationship exception, applied in this case. In her opinion, the children did not have a beneficial parent-child relationship

5

with Mother. They did not call her "Mommy" and looked to their caregivers to meet their daily needs. At the end of visits, I.E. ran to his caregivers so they could carry him. During some visits, R.E. had to be persuaded by his caregivers to show affection to Mother. Although R.E. stated a preference for living with Mother, Balogun believed his need for a safe, stable, and permanent home outweighed the sadness he might feel if he could no longer have contact with Mother. Balogun believed the children's parents continued to be unable to provide them with a safe, stable, and secure life. Accordingly, she recommended the court terminate Mother's parental rights and that adoption be ordered as the most appropriate permanent plan for the children.

At the conclusion of the hearing, the juvenile court found it likely the children would be adopted were parental rights terminated, none of the exceptions to termination apply, and that adoption was in the children's best interests. Accordingly, the court issued separate orders terminating Mother's parental rights to R.E. and I.E., and choosing adoption as their permanent plan.[2] The court designated the children's current foster parents as their prospective adoptive parents. Mother timely filed a notice of appeal from the two orders.

---

[2] The court also terminated the parental rights of R.E.'s and I.E.'s respective fathers.

DISCUSSION

I

*Section 366.26 and the Beneficial Parent-Child Relationship Exception*

"At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child.  If a child is likely to be adopted, adoption is the plan preferred by the Legislature.  [Citation.]  The Legislature has provided an exception to the general rule of adoption: the court should not order a permanent plan of adoption when termination of parental rights would be detrimental to the child because '[t]he parents . . . have maintained regular visitation and contact with the [child] and the [child] would benefit from continuing the relationship.' "  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50, quoting former § 366.26, subd. (c)(1)(A) (now § 366.26, subd. (c)(1)(B)(i)).)

"In the context of the dependency scheme prescribed by the Legislature, we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean *the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.*  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  *If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.*"  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575, italics added.)

7

"Interaction between [the] natural parent and child will always confer some incidental benefit to the child. The significant attachment from [the] child to [the] parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from [the] child to [the] parent." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.) "[F]or the [beneficial relationship] exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*Id.* at p. 468.) Frequent and loving contact between parent and child, without the existence of a parental role to the child, may be insufficient to justify the selection of a permanent plan other than adoption. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1420.)

"Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1) [e.g., the beneficial relationship exception]." (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.) On

8

appeal, "[w]e determine whether there is substantial evidence to support the [juvenile] court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.]  If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights under section 366.26, subdivision (c)."  (*Id*. at pp. 297-298.)  "Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

II

*Substantial Evidence to Support Juvenile Court's Finding That
Beneficial Parent-Child Relationship Exception Does Not Apply*

Mother contends the juvenile court erred by terminating her parental rights to R.E. and I.E. and selecting a permanent plan of adoption for them because there is substantial evidence showing the children have substantial, positive, and emotional attachments to her.  She asserts the evidence shows the beneficial parent-child relationship exception applies, making it detrimental to the children for her parental rights to be terminated.

A

Mother argues the juvenile court erred by finding she had not maintained regular visitation and contact with the children within the meaning of section 366.26, subdivision (c)(1)(B)(i).  At the contested section 366.36 hearing, the court stated there were "huge gaps" in Mother's visitation and contact with the children and found Mother had not

9

maintained regular visitation and contact with them. Therefore, it found the first requirement of the beneficial parent-child relationship exception did not apply.

Based on our review of the record, we conclude there is substantial evidence to support the juvenile court's finding that Mother did not maintain regular visitation and contact with R.E. and I.E. As discussed above, Mother did not contact the children for the first nine days after they were detained out of the home and did not visit them for the first month. She visited them only once during the first two months. She did not consistently visit them during the reunification period. During the four-month period between the termination of her reunification services and the initial section 366.26 hearing, Mother visited R.E. and I.E. only five times and called them sporadically. She did not keep in touch with the social worker to schedule visits and did not update her with her new telephone number. Although Mother's visitation was more consistent after the initial section 366.26 hearing, she still did not visit the children between February 14 and March 6, 2013, the date of the contested section 366.26 hearing when her parental rights were terminated.

To the extent Mother argues there is evidence to support a contrary finding that she regularly visited her children, she misconstrues and/or misapplies the substantial evidence standard we apply in reviewing the juvenile court's finding. It is not our function to reweigh the evidence or make inferences or deductions from the evidence. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) Those are questions for the juvenile court. (*Ibid*.) Mother's recitation of her visitation record does not persuade us the evidence is insufficient to support the court's finding that she did not maintain regular

10

visitation and contact with her children. She notes that during 2013 she had one visit in April, three visits in May, four visits in June, no visits in July, three visits in August, one visit and one call in October, some calls in November, and four visits and one call in December. During 2014, she apparently had four visits in January and two visits in February. The children's caregivers reported Mother usually called the children about once a week. Contrary to Mother's assertion, the evidence regarding her visitation and other contact with the children does not show the juvenile court could not reasonably infer from the evidence that she did not maintain regular visitation and contact with R.E. and I.E. within the meaning of section 366.26, subdivision (c)(1)(B)(i). There is substantial evidence to support the court's finding that Mother did not meet her burden to prove the first requirement of the beneficial parent-child relationship exception was met.

B

Mother also argues the juvenile court erred by finding R.E. and I.E. would not benefit from continuing their relationship with her within the meaning of section 366.26, subdivision (c)(1)(B)(i). At the contested section 366.36 hearing, the court stated R.E. has a bond with, or emotional attachment to, Mother and has "a longing to a degree to return to [her]." However, it also found R.E. and I.E. have bonded with their foster parents and benefited from the stability, care, and comfort they have received in the foster home. The court found that even though R.E. "may have some longing to see [Mother]," he would "truly be harmed" if he were to be taken out of his foster home and "the benefit that he would receive by returning to [Mother] is quite insubstantial compared to the benefit he's getting in the adoptive home." Although the children may have some

11

negative emotional response to never seeing Mother again, the court found that response did not outweigh "the great benefit of stability, love and care and true parents" the children would get by remaining with their foster parents. Accordingly, the court concluded the beneficial parent-child relationship exception did not apply to preclude termination of Mother's parental rights and selection of a permanent plan of adoption for R.E. and I.E.

Based on our review of the record, we conclude there is substantial evidence to support the juvenile court's finding that the second requirement for the beneficial parent-child relationship exception was not met. As discussed above, that exception may apply only if the parent-child "*relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents*. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added.) Alternatively stated, "[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*., italics added.)

Regarding I.E., the record shows he was detained out of the home when he was one year old and spent about 14 months away from Mother prior to the March 2014 section 366.26 hearing. Mother did not progress beyond supervised visits with him. During visits with Mother, I.E. preferred that his caregivers attend to his needs and easily

separated from her at the end of the visits. There is substantial evidence to support a finding that Mother did not have a parental role in I.E.'s life.

Regarding R.E., the record shows, as the juvenile court found, he had a bond with, or an emotional attachment to, Mother. Nevertheless, by the time of the March 2014 section 366.26 contesting hearing, he had lived apart from Mother for almost three of his seven years during his two dependency cases. Also, Mother did not progress beyond supervised visits with him in the current case. Balogun stated R.E. did not have a beneficial parent-child relationship with Mother. During visits with Mother, R.E. often played by himself, had to be persuaded by his caregivers to show affection toward Mother, and easily separated from Mother at the end of visits. Although R.E. wanted to live with Mother, Balogun believed his need for a safe, stable, and permanent home outweighed the sadness he might feel if he could no longer have contact with Mother.

Balogun concluded the children did not have a beneficial parent-child relationship with Mother. They did not call her "Mommy" and looked to their caregivers to meet their daily needs. Balogun believed the children's parents continued to be unable to provide them with a safe, stable, and secure life. She recommended the court terminate Mother's parental rights and that adoption be ordered as the most appropriate permanent plan for the children.

Contrary to Mother's assertion, there is substantial evidence to support the juvenile court's finding that she does not have a parent-child relationship with her children that promotes their well-being to such a degree as to outweigh the well-being the children would gain in a permanent home with new, adoptive parents. (*In re Autumn H.*, *supra*,

13

27 Cal.App.4th at p. 575.)  The court properly balanced the strength and quality of the natural parent-child relationship in a tenuous placement with Mother against the security and the sense of belonging adoptive placements would confer on R.E. and I.E.  (*Ibid.*)  Although Mother asserts the court should have chosen a lesser placement plan of guardianship or long-term foster care, the court reasonably chose the statutorily-preferred permanent plan of adoption over those lesser placement plans, finding "the great benefit of stability, love and care and true parents" the children would receive with adoption by their foster parents outweighed whatever benefit they would receive in a less permanent placement with continuing contact with Mother.  The court reasonably found Mother had not carried her burden to show R.E. and I.E. would be greatly harmed were their relationship with her terminated and they were adopted by their foster parents.  (*Ibid.*; cf. *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 425.)  Contrary to Mother's assertion, there is substantial evidence to support the court's finding that any anxiety R.E. would suffer from separation from Mother and the termination of his relationship with her did not outweigh the substantial benefit he would receive in a permanent adoptive home with his foster parents.

C

Because there is substantial evidence to support the juvenile court's findings that Mother did not maintain regular visitation and contact with R.E. and I.E. and that they would not benefit from continuing their relationship with her within the meaning of section 366.26, subdivision (c)(1)(B)(i), the court properly found the beneficial parent-child relationship exception to a permanent plan of adoption did not apply.  The court did

14

not err by terminating Mother's parental rights and choosing a permanent plan of adoption for the children.

DISPOSITION

The orders are affirmed.

McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.